PAUL L. REIN, Esq. (SBN 43053)
AARON M. CLEFTON, Esq. (SBN 318680)
REIN & CLEFTON, Attorneys at Law
200 Lakeside Drive, Suite A
Oakland, CA 94612
Telephone:    510/832-5001
Facsimile:    510/832-4787
info@reincleftonlaw.com

CHANTEL FITTING, Esq. (SBN 203378)
GALINE, FRYE & FITTING
411 Borel Ave, Suite 500
San Mateo, CA 94402
Telephone: (650) 345-8484
Facsimile: (650) 345-9875
cfitting@gff-law.com

Attorneys for Plaintiff
JUANITA GHENO

*Defense counsel listed after caption*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JUANITA GHENO,<br><br>Plaintiff,<br><br>v.<br><br>TAREQ Z. ALREHANI dba FANDEE'S RESTAURANT; WAEL Z. ALREHANI dba FANDEE'S RESTAURANT; STEPHEN CAVELLINI; GAIL CAVELLINI; AND DOES 1-10, INCLUSIVE,<br><br>Defendant. | Case No. 4:19-cv-01418-HSG<br>Civil Rights<br><br>**CONSENT DECREE AND ORDER FOR INJUNCTIVE RELIEF FOR INJUNCTIVE RELIEF, DAMAGES, AND ATTORNEY FEES, LITIGATION EXPENSES, AND COSTS**<br><br>Action Filed: March 18, 2019 |

HAL CHASE JR., ESQ.- State Bar No. 95789
**HARTSUYKER, STRATMAN & WILLIAMS-ABREGO**
Mailing Address:
P.O. Box 258829
Oklahoma City, OK 73)25-8829
Physical Address:
141 Stony Circle, Suite 145
Santa Rosa, CA 95401
Phone: (707) 544-0524
Fax: (707) 544-9381
Email: hal.chase@farmersinsurance.com

Attorney for Defendants
TAREQ Z. ALREHANI dbaFANDEE'S
RESTAURANT; WAEL Z. ALREHANI dba
FANDEE'S RESTAURANT

DAVID J. STREZA (SBN 209353)
VOGL MEREDITH BURKE LLP
456 Montgomery Street, 20th Floor
San Francisco, California 94104
Telephone No: (415) 398-0200
Facsimile No: ( 415) 398-2820
E-mail: dstreza@vmbllp.com

Attorney for Defendants
STEPHEN CAVELLINI and GAIL CAVELLINI

1.     Plaintiff JUANITA GHENO filed a Complaint in this action on March 18, 2019, to enforce provisions of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12101 *et seq.*, and California civil rights laws and to obtain recovery of damages for discriminatory experiences, denial of access, and denial of civil rights against Defendants TAREQ Z. ALREHANI dba FANDEE'S RESTAURANT; WAEL Z. ALREHANI dba FANDEE'S RESTAURANT; STEPHEN CAVELLINI; and GAIL CAVELLINI ("Defendants"). Plaintiff has alleged that Defendants violated Title III of the ADA; Sections 51, 52, 54, 54.1, 54.3 and 55, of the California Civil Code, and Health and Safety Code §§ 19953 *et. seq.* by failing to provide her and other similarly situated persons full and equal access to the public facilities of the restaurant known as Fandee's located at 7820-7824 Covert Lane, Sebastopol, California.

2.     In order to avoid the costs, expense, and uncertainty of protracted litigation, Plaintiff and Defendants (together sometimes the "Parties") agree to this Consent Decree and Order to resolve all claims regarding injunctive relief, damages, and attorneys' fees, litigation expenses and costs, raised in the Complaint without the need for protracted litigation. Accordingly, the Parties agree to the entry of this Order without trial or further adjudication of any issues of fact or law concerning Plaintiff's claims for relief.

**JURISDICTION:**

3. The Parties to this Consent Decree and Order agree that the Court has jurisdiction of this matter pursuant to 28 U.S.C. section 1331 for alleged violations of the Americans with Disabilities Act of 1990, 42 U.S.C. sections 12101 *et seq.* and pursuant to supplemental jurisdiction for alleged violations of California Civil Code sections 51, 54, and 54.1.

WHEREFORE, the Parties to this Consent Decree hereby agree and stipulate to the Court's entry of this Consent Decree and Order, which provide as follows:

**SETTLEMENT OF INJUNCTIVE RELIEF:**

4. This Order shall be a full, complete, and final disposition and settlement of Plaintiff's claims against Defendants for injunctive relief that have arisen out of the subject Complaint.

5. The Parties agree and stipulate that the corrective work will be performed in compliance with the standards and specifications for disabled access as set forth in the California Code of Regulations, Title 24-2, and Americans with Disabilities Act Standards for Accessible Design, unless other standards are specifically agreed to in this Consent Decree and Order.

    a. **Physical Remedial Measures and Administrative Procedures:** Defendants shall perform the recommended remedial work as set forth in the report of Kim Blackseth dated May 28, 2019, attached to this Consent Decree as **Exhibit A**.

    b. **Policy Based Remedial Measures and Administrative Procedures:** Defendants agree that within 45 days from the date of filing this document with the Court, Defendants will make the following policy commitments and train all staff, including managers regarding said policies:

        i. Defendants shall train staff and implement a policy of filling all

- 3 -

1     non-disabled seating first and only using disabled seating for
2     able-bodied patrons if all other seating is full and no disabled
3     persons are seated there.

4     ii.     Defendants shall train all staff and implement a policy to offer
5     reasonable accommodations for disabled persons, including
6     affirmatively inquiring with disabled patrons as to whether they
7     may need any reasonable accommodations.

8     iii.     Defendants shall train all staff and implement a policy to not
9     exclude persons from the Restaurant or its services on the basis
10     of his or her disability or use of mobility device or other
11     prosthesis.

12     iv.     Defendant shall maintain accessible features pursuant to
13     standards.

14     c.     **Timing**: Defendants will complete each item on the schedule stated in
15     this Consent Decree by March 1, 2020. In the event that unforeseen
16     difficulties prevent Defendants from completing any of the agreed-
17     upon injunctive relief, Defendants or its counsel will notify Plaintiff's
18     counsel in writing within seven (7) days of discovering the delay.
19     Plaintiff will have thirty (30) days to investigate and meet and confer
20     with Defendants, and to approve the delay by stipulation or otherwise
21     respond to Defendants' notice. If the Parties cannot resolve the issue
22     presented by the delay within this period, Plaintiff may seek
23     enforcement by the Court.

24     d.     Defendants or defense counsel will notify Plaintiff's counsel after the
25     corrective work has been completed, and, whether completed or not,
26     will provide a status report to Plaintiff's counsel by no later than
27     March 1, 2020.

28     e.     If Defendants fail to provide the aforementioned injunctive relief items

- 4 -

1  by the agreed upon date and/or fail to provide timely written status
2  notification, and Plaintiff files a motion with the Court to obtain
3  compliance with these terms after reasonable meet and confer efforts
4  have been unsuccessful, Plaintiff reserves the right to seek additional
5  reasonable attorney's fees for any compliance work necessitated by
6  Defendants' failure to meet the requirements of this agreement.  To
7  resolve the issue of disputed fees, the parties agree to participate in a
8  Magistrate Judge-conducted Settlement Conference.  If the Settlement
9  Conference fails to resolve the fee dispute, Plaintiff may seek relief via
10  motion for an order directing Defendants to pay Plaintiff's counsel
11  reasonably incurred fees.

**DAMAGES, ATTORNEYS' FEES, LITIGATION EXPENSES, AND COSTS:**

6.      Defendants agree to pay Plaintiff a total of $159,083 for Plaintiff's damages, attorney fees, litigation expenses, and costs. The damages, attorney fees, litigation expenses and costs shall be paid by check for a total amount of $159,083 to "REIN & CLEFTON IN TRUST FOR JUANITA GHENO" and delivered to Plaintiff's counsel's office, located at 200 Lakeside Drive, Suite A, Oakland California, by close of business on September 25, 2019.

**LIQUIDATED DAMAGES CLAUSE**

7.      Time is of the essence for this agreement.  Delay in payment to Plaintiff creates uncertainty for Plaintiff and Plaintiff's counsel in resolving this matter.  In the case of Plaintiff's counsel, this may also mean spending time pursuing collections issues instead of representing disabled persons on other matters and advancing the public interest in making other sites accessible.  In consideration of these issues, if Defendants do not pay both the attorney fees and damages contemplated in this Agreement on or before the date specified in this Agreement, Defendants agree to pay $250 per day for each day that payment is not

- 5 -

received by Plaintiff. If enforcement of the monetary terms of this agreement becomes necessary, Defendants agree that damages pursuant to this clause will be added to the settlement amount and any motion to enforce this agreement, motion for attorney fees in association with enforcement, and/or judgment entered by the Court.

**ENTIRE CONSENT DECREE AND ORDER:**

8.      This Consent Decree and Order constitute the entire agreement between the signing Parties on the matters of injunctive relief, damages, attorneys' fees, litigation expenses, and costs, and no other statement, promise, or agreement, either written or oral, made by any of the Parties or agents of any of the Parties that is not contained in this written Consent Decree and Order, shall be enforceable regarding the matters of injunctive relief described herein.

**CONSENT DECREE AND ORDER BINDING ON PARTIES AND SUCCESSORS IN INTEREST:**

9.      This Consent Decree and Order shall be binding on Plaintiff, Defendants, and any successors-in-interest. Defendants have a duty to so notify all such successors-in-interest of the existence and terms of this Consent Decree and Order during the period of the Court's jurisdiction of this Consent Decree and Order.

10.      Except for all obligations required in this Consent Decree and Order each of the Parties to this Consent Decree and Order, on behalf of each of their respective agents, representatives, predecessors, successors, heirs, partners, and assigns, releases and forever discharges each other Party and all officers, directors, shareholders, subsidiaries, joint venturers, stockholders, partners, parent companies, employees, agents, attorneys, insurance carriers, heirs, predecessors, and representatives of each other Party, from all claims, demands, actions, and causes of action of whatever kind or nature, presently known or unknown, arising out of or in any way connected with the lawsuit, except for any and all obligations specifically excluded as described below.

- 6 -

**MUTUAL RELEASE AND WAIVER OF CIVIL CODE SECTION 1542:**

11.     Each of the Parties to this Consent Decree and Order understands and agrees that there is a risk and possibility that, subsequent to the execution of this Consent Decree and Order, any or all of them will incur, suffer, or experience some further loss or damage with respect to the lawsuit that is unknown or unanticipated at the time this Consent Decree and Order is signed. Except for all obligations required in this Consent Decree and Order, the Parties intend that this Consent Decree and Order apply to all such further loss with respect to the lawsuit, except those caused by the Parties subsequent to the execution of this Consent Decree and Order. Therefore, except for all obligations required in this Consent Decree and Order, this Consent Decree and Order shall apply to and cover any and all claims, demands, actions, and causes of action by the Parties to this Consent Decree with respect to the lawsuit, whether the same are known, unknown, or hereafter discovered or ascertained, and the provisions of Section 1542 of the California Civil Code are hereby expressly waived. Section 1542 provides as follows:

> **A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASING PARTY**

12.     Except for all obligations required in this Consent Decree and Order, each of the Parties to this Consent Decree and Order, on behalf of their respective agents, representatives, predecessors, successors, heirs, partners, and assigns, releases and forever discharges each other Party and all officers, directors, shareholders, subsidiaries, joint venturers, stockholders, partners, parent companies, employees, agents, attorneys, insurance carriers, heirs, predecessors, and representatives of each other Party, from all claims, demands, actions, and causes of action of whatever kind or nature, presently known or unknown, arising out of or in any way connected with the lawsuit.

- 7 -

13.     This Decree and Order specifically excludes the obligations by and between the Defendants under their existing commercial lease agreement.  That commercial lease agreement remains in place and Defendants obligations under that agreement are not affected by this Consent Decree.

**EFFECTIVE TERM OF THE CONSENT DECREE AND ORDER:**

14.     This Consent Decree and Order shall be in full force and effect for a period of eighteen (18) months after the date of entry of this Consent Decree and Order by the Court.

**SEVERABILITY:**

15.     If any term of this Consent Decree and Order is determined by any court to be unenforceable, the other terms of this Consent Decree and Order shall nonetheless remain in full force and effect.

**SIGNATORIES BIND PARTIES:**

16.     Signatories on the behalf of the Parties represent that they are authorized to bind the Parties to this Consent Decree and Order.  This Consent Decree and Order may be signed in counterparts and a facsimile signature shall have the same force and effect as an original signature.

**END OF PAGE.**
**SIGNATURES CONTINUE ON THE NEXT PAGE AND ORDER IS AT THE END OF THE DOCUMENT.**

Dated: _11-8-19_, 2019          PLAINTIFF JUANITA GHENO


                                _Juanita Gheno_
                                JUANITA GHENO


Dated: _____, 2019         TAREQ Z. ALREHANI


                                _____
                                TAREQ Z. ALREHANI


Dated: _____, 2019         WAEL Z. ALREHANI


                                _____
                                WAEL Z. ALREHANI


Dated: _____, 2019         STEPHEN CAVELLINI


                                _____
                                STEPHEN CAVELLINI

Dated: _____, 2019         GAIL CAVELLINI


                                _____
                                GAIL CAVELLINI


Approved as to form:

Dated: _11|20|_2019             REIN & CLEFTON


                                _Paul L. Rein_
                                By:  PAUL L. REIN, ESQ.
                                Attorneys for Plaintiff
                                JUANITA GHENO

- 9 -

| | | |
|---|---|---|
| 1 | Dated: _____, 2019 | PLAINTIFF JUANITA GHENO |
| 2 | | |
| 3 | | |
| 4 | | JUANITA GHENO |
| 5 | Dated: _11/5_, 2019 | TAREQ Z. ALREHANI |
| 6 | | |
| 7 | | |
| 8 | | TAREQ Z. ALREHANI |
| 9 | | |
| 10 | Dated: _11/5_, 2019 | WAEL Z. ALREHANI |
| 11 | | |
| 12 | | |
| 13 | | WAEL Z. ALREHANI |
| 14 | Dated: _____, 2019 | STEPHEN CAVELLINI |
| 15 | | |
| 16 | | |
| 17 | | STEPHEN CAVELLINI |
| 18 | Dated: _____, 2019 | GAIL CAVELLINI |
| 19 | | |
| 20 | | |
| 21 | | GAIL CAVELLINI |
| 22 | | |
| 23 | Approved as to form: | |
| 24 | Dated: _____, 2019 | REIN & CLEFTON |
| 25 | | |
| 26 | | |
| 27 | | By: PAUL L. REIN, ESQ. |
| 28 | | Attorneys for Plaintiff |
| | | JUANITA GHENO |

- 9 -

Dated: _____, 2019       PLAINTIFF JUANITA GHENO

                               _____
                               JUANITA GHENO

Dated: _____, 2019       TAREQ Z. ALREHANI

                               _____
                               TAREQ Z. ALREHANI

Dated: _____, 2019       WAEL Z. ALREHANI

                               _____
                               WAEL Z. ALREHANI

Dated: *NOV 8*, 2019           STEPHEN CAVELLINI

                               _____
                               STEPHEN CAVELLINI

Dated: *Nov 8*, 2019           GAIL CAVELLINI

                               _____
                               GAIL CAVELLINI

Approved as to form:
Dated: _____, 2019                    REIN & CLEFTON

                               _____
                                             By:  PAUL L. REIN,
ESQ.
                               Attorneys for Plaintiff
                               JUANITA GHENO

9

1    Dated: _11/24_, 2019        HARTSUYKER, STRATMAN & WILLIAMS-
                                           ABREGO

2

3

4                                   By: ~~DAVID J. STREZA, ESQ.~~ *Hal CHASE, Jr*

5                                   Attorneys for Defendants
                                  TAREQ Z. ALREHANI dbaFANDEE'S

6                                   RESTAURANT; WAEL Z. ALREHANI dba
                                  FANDEE'S RESTAURANT

7

8    Dated: _____, 2019          VOGL MEREDITH BURKE LLP

9

10                                   By: DAVID J. STREZA, ESQ.

11                                   Attorneys for Defendants
                                  STEPHEN CAVELLINI and GAIL CAVELLINI

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Dated: _____, 2019

HARTSUYKER, STRATMAN & WILLIAMS-ABREGO

STREZA, ESQ.

_____
By: DAVID J.

Attorneys for Defendants
TAREQ Z. ALREHANI dbaFANDEE'S
RESTAURANT; WAEL Z. ALREHANI dba
FANDEE'S RESTAURANT

Dated: _____, 2019

VOGL MEREDITH BURKE LLP

STREZA, ESQ.

_____
By: DAVID J.

Attorneys for Defendants
STEPHEN CAVELLINI and GAIL CAVELLINI

**ORDER**

Pursuant to stipulation, and for good cause shown, IT IS SO ORDERED.

Dated: 2/5/2020

Honorable Haywood S. Gilliam, Jr.
United States District Court Judge

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

- 11 -

# EXHIBIT A



*Kim R. Blackseth, Interests, Inc.*
*1726 Jefferson Street*
*Napa, CA 94559*

*Phone 707-255-5576*

May 28, 2019

Hal Chase
Hartsuyker, Stratman & Williams-Abrego
141 Stony Circle, Suite 145
Santa Rosa, CA 95401

Email: hal.chase@farmersinsurance.com

**RE: Fandee's Restaurant: 7824 Covert Lane, Sebastopol, CA**
  **Inspected by a CASp**

Dear Mr. Chase:

At your request, on or about March 17, 2019, we reviewed the subject facility in Sebastopol, CA for compliance with State of California's Title 24, Building Code (CBC), with the California Amendments and the federal Americans with Disabilities Act of 1990 (ADA), as they relate to physical disabled access. A brief discussion of these requirements is as follows:

**California Building Code**

The first California access laws for newly constructed buildings (Health and Safety Code 19955) were passed in 1969. In 1971, Health and Safety Code 19959 was passed that required all alterations, repairs and additions be accessible in public accommodations.

In 1982, the California Building Code Title 24 (CBC Title 24) went into effect replacing the 1961 ANSI standards. The CBC Title 24 accessibility standards were revised in 1984, 1986, 1987, 1989, 1994, 1996, 1998, 2001, 2007, 2010 and 2013. The current 2016 CBC became effective January 1st, 2017.

This facilities obligation to comply with the California Building Code (CBC) depends largely on its construction date and alteration history. If an alteration (as defined in the CBC) is performed, these facilities have to comply with the edition of the CBC in effect on the date of their last alteration.

This obligation would include the functional area renovated, the path of travel to them and the sanitary facilities that support them, not the entire facility. If an alteration is performed, the date of those renovations reveals the applicable editions of the State Building Code that will determine what additional access features are required.

**The Americans with Disabilities Act**

The ADA was signed into law on July 26, 1990 and revised in 2010 (effective March 12, 2012). It contains requirements for new construction, for alterations or renovations to buildings and facilities, and for improving access to existing facilities of private companies providing goods or services to the public and requires reasonable modifications of policies and practices that may be discriminatory

The ADAAG and 2010 ADA Standards were developed for New Construction and Alterations. Existing facilities not otherwise being altered are subject to requirements specified in the DOJ regulations. Title III entities must pursue barrier removal – or alternatives – in existing places of public accommodation. Broadly viewed, ADA implementing regulations outline a hierarchy of obligations:

- New construction must be fully accessible, in compliance with applicable provisions of the ADA;

- Alterations must observe new construction criteria where technically feasible; less stringent technical specifications may be applied where technical unfeasibility is encountered; alterations to primary function areas carry an additional obligation to improve the path of travel to the altered area;

- Existing Public Accommodation facilities must achieve a level of usability that balances user needs, the constraints of existing conditions, and the resources available for remedial work. If you are a "Commercial Facility", you are not subject to barrier removal.

- Commercial facilities, which are not public accommodations, such as office buildings, factories and warehouses are not subject to barrier removal. However, they must comply with the ADA architectural standards for new construction and alterations when built or altered.

**Readily Achievable Barrier Removal**

As in the 1991 Standards, the 2010 Standards requires removal of architectural barriers in existing Public Accommodations, when it is "readily achievable" to do so. Readily achievable means "easily accomplishable without much difficulty or expense."

This requirement is partly based on the size and resources of an entity. So, entities with more resources are expected to remove more barriers than facilities with fewer resources.

Readily achievable barrier removal may include providing an accessible route from a parking lot to the entrance, installing an entrance ramp, widening a doorway, installing accessible door hardware, repositioning shelves, or moving tables, chairs, display racks, vending machines, or other furniture.

When removing barriers, facilities are required to comply with the 2010 Standards to the extent possible. For example, where there is not enough space to install a ramp with a slope that complies with the Standards, a business may install a ramp with a slightly steeper slope. However, any deviation from the Standards must not pose a significant safety risk.

**What Contributes to the Determination of "Readily Achievable"?**

      I. Nature and cost of the action
      II. Overall financial resources of the local site
      III. Number of persons employed
      IV. Effect on expenses and resources
      V. Legitimate safety requirements that are necessary for safe operation
      VI. Impact otherwise on the operation of the site
      VII. Fundamental alteration of the programs, services, benefits, activities, goods, etc.
      VIII. Other barriers being removed
      IX. Relationship to the parent company
      A. Geographic separateness
      B. Administrative or fiscal relationship of site to parent company
      C. If applicable:
          1. Overall financial resources and assets
          2. Parent company s budget
          3. Size of parent company in number of employees
          4. Number, type and location of other facilities
          5. Type of operations of parent company
          6. Composition, structure and functions of workforce
      X. Significant loss of selling or serving space
      XI. Never exceeds the new construction requirements

**The Department's regulation contains a list of 21 examples of modifications that may be readily achievable. These are not all inclusive, but are illustrative of the DOJ's intent:**

      1) Installing ramps;
      2) Making curb cuts in sidewalks and entrances;
      3) Repositioning shelves;
      4) Rearranging tables, chairs, vending machines, display racks, and other furniture;
      5) Repositioning telephones;
      6) Adding raised markings on elevator control buttons;
      7) Installing flashing alarm lights;

8) Widening doors;
9) Installing offset hinges to widen doorways;
10) Eliminating a turnstile or providing an alternative accessible path;
11) Installing accessible door hardware;
12) Installing grab bars in toilet stalls;
13) Rearranging toilet partitions to increase maneuvering space;
14) Insulating lavatory pipes under sinks to prevent burns;
15) Installing a raised toilet seat;
16) Installing a full-length bathroom mirror;
17) Repositioning the paper towel dispenser in a bathroom;
18) Creating designated accessible parking spaces;
19) Installing an accessible paper cup dispenser at an existing inaccessible water fountain;
20) Removing high pile, low density carpeting; or
21) Installing vehicle hand controls.


## New Construction and Alterations

The ADA requires that all new facilities built by public accommodations, including small businesses, must be accessible to and usable by people with disabilities. The 2010 Standards lay out accessibility design requirements for newly constructed and altered public accommodations and commercial facilities. Certain dates in the construction process determine which ADA standards—the 1991 Standards or the 2010 Standards—must be used.

### Alterations (ADA)

When a small business undertakes an alteration to any of its facilities, it must, to the maximum extent feasible, make the alteration accessible. An alteration is defined as remodeling, renovating, rehabilitating, reconstructing, changing or rearranging structural parts or elements, changing or rearranging plan configuration of walls and full-height partitions, or making other changes that affect (or could affect) the usability of the facility.


### Construction/Alteration History Analysis

The construction/alteration history has been requested from the local building department. However, it was represented to us the tenant space was significantly altered in approximately 2011. To firmly establish which editions of the CBC (and to confirm ADAAG requirements) the building history should be researched with the local enforcing agency.

The 2010 CBC and the 1991 ADAAG guided the alteration in 2011. If subsequent permit history reveals alterations have taken place, the report conclusions may need to be re-visited.

**Facility Survey**

The facility is a restaurant located in Sebastopol, CA. Our comments on the existing conditions are as follows:



**Path of Travel from the Public Right of Way (off Covert Lane)**

- The entry leading from the public sidewalk has steps (Fig 1.1). *We recommend providing signage directing to the accessible path of travel on Healdsburg Avenue (see Fig A for example);*



*Fig 1.1*



*Fig A*

- The stairway (previous Fig 1.1) does not have constrast striping.  ***Provide contrast striping on each exterior stair tread (see details below).***

    *The stripe shall be a minimum of 2 inches (51 mm) wide to a maximum of 4 inches (102 mm) wide placed parallel to, and not more than 1 inch (25 mm) from, the nose of the step or upper approach. The stripe shall extend the full width of the step or upper approach and shall be of material that is at least as slip resistant as the other treads of the stair. A painted stripe shall be acceptable. Grooves shall not be used to satisfy this requirement.*



*Fig B*

- The stair handrails are 27″ high (see Fig 1.2). ***Modify and provide handrails 34″ to 38″ above the ground or nosing of each stair tread (see previous Fig B for details);***



*Fig 1.2*

**Path of Travel from the Public Right of Way (off Healdsburg Avenue)**

- The path of travel from the public way near the rear corner of Fandee's has cross slopes up to 5.6% (Fig 1.3). ***We recommend providing signage directing to the accessible path of travel hear the front of the building on Healdsburg Avenue (see Fig A for sign example);***





*Fig 1.3*

- The path of travel from the public way near the front area of Fandee's provides the correct width and slopes (Fig 1.4). The walkway has maximum cross slopes of 2.8%, which we believe is within conventional industry tolerance. ***The directional signage discussed above should lead to this path of travel off the public way;***





*Fig 1.4*

**Existing Parking and Curb Ramp**

The total number of parking spaces for the facility determines the number of accessible parking spaces required (see Fig C). Fandee's is located in a multi-tenant shopping center. There are approximately 23 parking spaces directly supporting the restaurant. Therefore, one van accessible parking space should support the restaurant. Currently, there is one van space near supporting Fandee's. Our comments on the existing conditions are as follows:

| Total Number of Parking Spaces Provided in Parking Facility | Minimum Number of Required Accessible Parking Spaces |
|---|---|
| 1 to 25 | 1 |
| 26 to 50 | 2 |
| 51 to 75 | 3 |
| 76 to 100 | 4 |
| 101 to 150 | 5 |
| 151 to 200 | 6 |
| 201 to 300 | 7 |
| 301 to 400 | 8 |
| 401 to 500 | 9 |
| 501 to 1000 | 2 percent of total |
| 1001 and over | 20, plus 1 for each 100, or fraction thereof, over 1000 |

*Fig C*

- The tow signs are provided at the entry to the off-street parking lot supporting Fandee's, however the blank spaces are not filled in (Fig 1.5). ***Modify and fill in blank spaces on each tow sign.***




*Fig 1.5*

- The accessible parking space (Fig 1.6) is 8'11" wide (minimum 9' required). We believe this is within conventional industry tolerance. ***No action required;***


*Fig 1.6*

- The accessible parking space and access aisle have a slope of 4.4%-9.3% near the head of the space at the gutter (Fig 1.7 below). ***Modify and provide a slope of 2% or less in any direction within the accessible parking space and access aisle;***





*Fig 1.7*

- The accessible parking is missing the required signage.  ***Provide the Minimum Fine $250, ISA and Van Accessible signage for the accessible space.  See Fig D below for details (must be mounted 80" above the ground to the bottom of the sign if in a path of travel or 60" to the bottom of the sign if located on a wall);***





*Fig D*



*Fig 1.8*



*Fig E*

12

**Path of Travel (from accessible parking to entry)**

- The path of travel near the pillar is 43″ wide if the car overhangs past the curb (Fig 1.9). *Modify and provide wheel stops for the parking spaces adjacent to the pillar to prevent the car from obstructing the path of travel;*





*Fig 1.9*

- The walkway has a cross slope of 2.3% (Fig 2.1 below). We believe this is within conventional industry tolerance. *No action required;*



*Fig 2.1*

**Primary Entry**

- The pull side landing has a slope of 7% in the direction of travel (Fig 2.2). ***Modify and provide a 60″ deep landing on the pull side of the entry door with a slope of 2% or less in any direction (see Fig F for detail). Note: a powered door opening device will mitigate the issue;***



*Fig 2.2*

- The entry door requires 12 lbs. of effort to operate. ***Adjust and maintain door effort to 5 lbs. or less. Note: a powered door opening device will mitigate the issue;***



*Fig F*

- The entry door does not have a 10″ smooth bottom surface (previous Fig 2.2). ***Modify and provide a 10″ high smooth and uninterrupted bottom surface on the push side of the entry door (see Fig G for detail). Note: a powered door opening device will mitigate the issue;***



*Fig G*

**Interior**

- The exit doors (Fig 2.3 below) do not have the tactile and Braille exit sign. ***Modify and provide the tactile and contracted Grade 2 Braille sign at all exits and mount as described below and in Fig H. Note: CA Braille spacing is required and shown below (Fig I below), as it differs from the Federal standards;***





*Fig 2.3*

**11B-703.4.2 Location -** *Where a tactile sign is provided at a door, the sign shall be located alongside the door at the latch side. Where a tactile sign is provided at double doors with one active leaf, the sign shall be located on the inactive leaf. Where a tactile sign is provided at double doors with two active leafs, the sign shall be located to the right of the right-hand door. Where there is no wall space at the latch side of a single door or at the right side of double doors, signs shall be located on the nearest adjacent wall. Signs containing tactile characters shall be located so that a clear floor space of 18 inches (457 mm) minimum by 18 inches (457 mm) minimum, centered on the tactile characters, is provided beyond the arc of any door swing between the closed position and 45-degree open position. Where permanent identification signage is provided for rooms and spaces they shall be located on the approach side of the door as one enters the room or space. Signs that identify exits shall be located on the approach side of the door as one exits the room or space.*



*Fig H – Height Requirements*

| Measurement Range | Minimum in Inches<br>Maximum in Inches |
|---|---|
| Dot base diameter | 0.059 (1.5 mm)<br>to<br>0.063 (1.6 mm) |
| Distance between two dots in the same cell[1] | 0.100 (2.5 mm) |
| Distance between corresponding<br>dots in adjacent cells[1] | 0.300 (7.6 mm) |
| Dot height | 0.025 (0.6 mm)<br>to<br>0.037 (0.9 mm) |
| Distance between corresponding dots<br>from one cell directly below[1] | 0.395 (10 mm)<br>to<br>0.400 (10.2 mm) |
| 1.   Measured center to center. | |



*Fig I – CBC Spacing Requirements*

- There are approximately 58 total seating spaces (tables and booths) and there are no accessible tables due to the table base (Fig 2.4) or booth seating.  5% of seating spaces are required to be accessible.   *Modify and provide 5% of seating spaces with knee and toe clearance illustrated in Fig J below;*



*Fig 2.4*



*Fig J*

- The main counter is 42″ high (Fig 2.5). If transactions occur at the counter (for to go orders) a lowered transaction counter will be required. ***Provide a lowered counter 34″ high maximum above the floor by a minimum of 36″ long (see Fig K below for detail);***



*Fig 2.5*



*Fig K*

- The dining counter is 37″ high (Fig 2.6). ***Modify and provide a lowered dining counter 34″ high by a minimum of 60″ long and 19″ deep minimum, if counter was built in the 2011 alteration (see Fig L below for detail);***



*Fig 2.6*



*Fig L*

**Path of Travel (to patio seating)**

- The exit door requires 10 lbs. of effort to operate and closes within 2 seconds (Fig 2.7). ***Adjust and maintain door effort to 5 lbs. or less and a closing speed of 5 seconds minimum.   Note: a powered door opening device will mitigate the issue;***



*Fig 2.7*

- The pull side landing has a slope of 9.8% in the direction of travel (Fig 2.8 below). ***Modify and provide a 60″ deep landing on the pull side of the entry door with a slope of 2% or less in any direction (see previous Fig F for detail).  Note: a powered door opening device will mitigate the issue;***



*Fig 2.8*

**Patio**

- The gate does not have a 10″ smooth bottom surface (Fig 2.9). *Modify and provide a 10″ high smooth and uninterrupted bottom surface on the push side of the gate (see previous Fig G for detail);*



*Fig 2.9*

- The gate hardware (Fig 3.1) requires twisting and grasping to operate. ***Modify and provide hardware that does not require tight grasping, pinching or twisting of the wrist to operate;***



*Fig 3.1*

- There are approximately 20 total seating spaces in the patio area and there are no accessible tables due to the table base (Fig 3.2).  5% of seating spaces are required to be accessible.  ***Modify and provide 5% of seating spaces with knee and toe clearance illustrated in Fig J above;***



*Fig 3.2*

**Path of Travel (to restrooms)**

- The door leading to the restroom area has a closer and latch with only 5″ of strike clearance on the push side (Fig 3.3 – minimum 12″ required). ***We recommend removing the closer or latch to mitigate the issue;***



*Fig 3.3*



*Fig M*

- The door leading to the restroom area requires 8 lbs. or effort and closes within 2 seconds. ***Adjust and maintain door effort to 5 lbs. or less and a closing speed of 5 seconds minimum;***

- The chairs obstruct the pull side landing for the door (Fig 3.4). ***Remove chairs and maintain a 60″ deep landing on the pull side of the door (see previous Fig F for detail);***



*Fig 3.4*

**Restroom (left side)**

- The correct door sign is not provided (Fig 3.5). ***Modify and provide the required door sign and mount 58″ to 60″ above the ground to the center of the sign. Note: the circle symbol must contrast with the door and the triangle symbol must contrast with the circle (see example below);***



*Fig 3.5*



*Fig N*

- The required wall sign is not provided.  The sign on the door has incorrect Braille spacing.  ***Provide a wall sign with contracted Grade 2 Braille with CA spacing (see previous Fig I for Braille spacing requirements);***



*Fig O*

- The lavatory pipes are not insulated (Fig 3.6). *Modify and provide insulation on the hot water supply and drain pipes;*



*Fig 3.6*

- The mirror is mounted 51″ above the floor (Fig 3.6). *Modify or add an additional mirror no higher than 40″ above the floor to the bottom reflective surface. A full-length mirror on the door would mitigate the issue;*

- The flush valve is located in the incorrect side of the toilet (Fig 3.7). *Modify and provide the flush valve on the transfer/wide side of the toilet;*



*Fig 3.7*

- The side and rear grab bars are mounted 37″ above the floor (Fig 3.7). *Modify and remount grab bars 33″ minimum to 36″ maximum above the floor to the top of the gripping surface;*

- The toilet tissue dispenser is mounted 16″ above the floor (Fig 3.8). *Modify and remount toilet tissue dispenser a minimum of 19″ above the floor below the side grab bar, 7″ to 9″ in front of the toilet (see Fig P for detail);*



*Fig 3.8*



*Fig P*

**Restroom (right side)**

- The correct door sign is not provided (Fig 3.9). *Modify and provide the required door sign and mount 58″ to 60″ above the ground to the center of the sign. Note: the circle symbol must contrast with the door and the triangle symbol must contrast with the circle (see example above);*



*Fig 3.9*

- The required wall sign is not provided. The sign on the door has incorrect Braille spacing. *Provide a wall sign with contracted Grade 2 Braille with CA spacing (see previous Fig I for Braille spacing requirements);*

- The restroom door has a closer and latch with only 8″ of strike clearance on the push side (Fig 4.1 – minimum 12″ required). *We recommend removing the closer or latch to mitigate the issue;*



*Fig 4.1*

- The lavatory pipes are not insulated (Fig 4.2). ***Modify and provide insulation on the hot water supply and drain pipes;***



*Fig 4.2*

- The mirror is mounted 49″ above the floor (Fig 4.2). ***Modify or add an additional mirror no higher than 40″ above the floor to the bottom reflective surface. A full-length mirror on the door would mitigate the issue;***

- The toilet tissue dispenser is mounted 14″ above the floor (Fig 4.3). ***Modify and remount toilet tissue dispenser a minimum of 19″ above the floor below the side grab bar, 7″ to 9″ in front of the toilet (see previous Fig P for detail);***



*Fig 4.3*

**This concludes our comments on the existing conditions.**

***If a power assisted door-opening device is used, it should meet the following requirements:***

*c. Powered doors shall be controlled on both the interior and exterior sides of the doors by sensing devices, push plates, vertical actuation bars or other similar operating devices complying with divisions 11B-304, 11B-305 and 11B-308.*

*At each location where push plates are provided there shall be two push plates; the centerline of one push plate shall be 7 inches (178 mm) minimum and 8 inches (203 mm) maximum above the floor or ground surface and the centerline of the second push plate shall be 30 inches (762 mm) minimum and 44 inches (1219 mm) maximum above the floor or ground surface. Each push plate shall be a minimum of 4 inches (102 mm) diameter or a minimum of 4 inches by 4 inches (102 mm by 102 mm) square <u>and shall display the International Symbol of Accessibility complying with Division 11B-703.7.</u>*

*At each location where, vertical actuation bars are provided the operable portion shall be located so the bottom is 5 inches (127 mm) maximum above the floor or ground surface and the top is 35 inches (889 mm) minimum above the floor or ground surface. The operable portion of each vertical actuation bar shall be a minimum of 2 inches (51 mm) wide and shall display the International Symbol of Accessibility complying with Division 11B-703.7.*
*Where push plates, vertical actuation bars or other similar operating devices are provided, they shall be placed in a conspicuous location. <u>A level and clear floor or ground space for forward or parallel approach complying with 11B-305 shall be provided, centered on the operating device. Doors shall not swing into the required clear floor or ground space.</u>*



**Construction Tolerance Discussion**

In our previous comments, we have also cited various locations we believe are within "constructional or dimensional tolerance".  The basis for our opinion is laid out below:

The CBC and ADA both allow for construction and manufacturing tolerances:

> *CBC 1101B.5 Construction and manufacturing tolerances. All dimensions are subject to conventional industry tolerances except where the requirement is stated as a range with specific minimum and maximum end points.*

> *ADA 104.1.1 Construction and Manufacturing Tolerances. All dimensions are subject to conventional industry tolerances except where the requirement is stated as a range with specific minimum and maximum end points.*

The 24" digital level is the industry standard used by professionals and recognized by the US Department Of Justice (DOJ) as such.  Although the digital level is a fairly precise instrument, they are not perfect.

The devices come from the manufacturer with at stated margin of error, as they guarantee accuracy within 0.2 degrees or 0.4 percent.  As we measure as a percentage of slope, when 0.2 degrees is translated into percentage, you get 0.35% or 0.4%.  This means any field reading of the digital level itself could be off by 0.4% in either direction.  In the context of ramps, this means a reading of 8.3% may indicate an actual slope anywhere between 7.9% and 8.7%.

The CBC and ADA allow for conventional industry tolerances in construction and manufacturing in determining compliance with the Standards.  While the Standards plainly state that all dimensions are subject to industry tolerances, the tolerance dimensions themselves will vary greatly depending on, among other things, the architectural feature being constructed and the building materials being used.  For example, woodwork fabricated in a mill shop with precise equipment can be closer to perfection than a concrete ramp.  Thus, the accepted tolerances for the woodworking industry will necessarily be relatively minor as compared to the accepted tolerances for the concrete industry.

One of the concrete industry's most widely recognized sources on tolerances is the American Concrete Institute's report entitled "117-10 Specification for Tolerances for Concrete Construction and Materials and Commentary" ("ACI 117").  The tolerance established by ACI 117 is not phrased in terms of a percentage deviation.  Rather, ACI 117 states that a slope is within conventional industry tolerances if, using a 10-foot straight edge, no gap between the straight edge and the surface exceeds 0.25".

However, ACI 117 does not limit the number of such gaps.  This is probably so because the natural properties of materials such as concrete and asphalt make it very difficult to construct a surface free of minor imperfections or gaps.  Thus, in the context of a slope being measured with a 24" level, it would be reasonable to expect that at any single point, the actual measurement taken could easily be off by 0.25" per foot, or 2.1%.  Once we factor in the 0.4% margin of error for instrument accuracy, that means a ramp slope measurement could be as high as 10.8% (8.7% + 2.1%), and still be compliant with the ACI 117 allowable tolerance.

In addition to the information above, the US Access Board issued a research report (Initiative of Dimensional Tolerances in Construction, Dimensional Tolerances for Surface Accessibility) in January 2011 to deal with this very issue.

In Section 1.2 (Suggested Tolerances) of the report, pedestrian ramps are specifically dealt with.  Section 1.2.5 states: *"When overall running slope and cross slope for accessible ramps are measured according to Section 1.1.11 a recommended tolerance for these slopes is +0.5%."*  It further states when a design slope of 1:12 (8.33%) is indicated, a tolerance of +0.5% is reasonable.

Section 1.2.6 deals with local variations (small bumps or humps in the concrete) that can cause a single rise in slope along a small area of the ramp.  It states at least 80% of the measurements should not exceed an 8.3% slope and the remaining measurements (20%) should not exceed a 10% slope.  The Courts have also agreed that a slope deviation of 1.0% is within industry tolerance.  In Lonberg v. City of Riverside, a case in which I was the testifying expert for the defendant, the Court found that a 1.0% slope deviation falls within conventional industry tolerances.  ("As it relates to concrete finish work for curb ramp and sidewalk construction the Court finds that the industry tolerance is 1%.  Thus, for example, even though the . . . design standard requires that a curb ramp running slope not exceed 8.33%, and that the City should use the least possible slope when constructing any curb ramp, the dimensional tolerance would permit the construction of a curb ramp to be as steep as 9.33% under appropriate conditions.").

The US Access Board (developers of ADA Standards) funded a study on tolerances that was presented to the USAB, which was prepared by David Kent Ballast and dated January 2011. The following are excerpts:

## RECOMMENDED MEASUREMENT TOLERANCE

Based upon simplicity, accuracy and easy transportability the 24" digital level will most likely continue to be the tool of choice. Based upon the analysis above, as long as no single reading exceeds 2.5% above the minimum requirement, the surface should not fail.

The question then becomes what measurement is reasonable to expect from the actual construction. The answer to this must be based upon what is actually being measured with the tool. It is simply a 2 foot long section of surface.

This can be considered in 2 ways. First for measuring device accuracy, the instrument and technique for measurement should provide for an accuracy of at least 1/3 the required tolerance. With our known accuracy of the level of 0.4% this would allow for a minimum required tolerance of 1.2%. Second, based upon the ACI standard allowable 1/4" gap, the tolerance would become 1/4 inch over 2 feet or 1/8 inch per foot. This establishes an actual construction tolerance of 1.0%. Combine this with the tool accuracy and you get an allowable tolerance of 1.4% (0.4% + 1.0%).

Based upon this logic, our recommend actual allowable measurements are as follows:

| Item | Standard | Proposed Tolerance | Proposed Measurement | Maximum (1 Time) |
|---|---|---|---|---|
| Cross Slopes | 2.0% | +1.4% | ≤3.4% | ≤4.5% |
| Running Slopes | 5.0% | +1.4% | ≤6.4% | ≤7.5% |
| Ramp Slopes | 8.3% | +1.4% | ≤9.7% | ≤10.8% |

## Schedule

As required by the CASp regulations and SB 1186, a schedule to correct these items is necessary. Please comply with these recommendations within 180 days.

## CASp Status

We are certified by the *State of California* as a *Certified Access Specialist (CASp #021)*. As such, this report can be considered an ***Inspected by a CASp*** document.

"Inspected by a CASp" means the site was inspected by a CASp and is pending a determination by the CASp that the site meets applicable construction-related accessibility standards pursuant to paragraph (2) of subdivision (a) of Section 55.53. This gives you certain rights, if a suit/claim is made against this property.

## CASp Notice

NOTICE TO PRIVATE PROPERTY OWNER/TENANT: YOU ARE ADVISED TO KEEP IN YOUR RECORDS ANY WRITTEN INSPECTION REPORT AND ANY OTHER DOCUMENTATION CONCERNING YOUR PROPERTY SITE THAT IS GIVEN TO YOU BY A CERTIFIED ACCESS SPECIALIST. IF YOU BECOME A DEFENDANT IN A LAWSUIT THAT INCLUDES A CLAIM CONCERNING A SITE INSPECTED BY A CERTIFIED ACCESS SPECIALIST, YOU MAY BE ENTITLED TO A STAY (TEMPORARY STOPPAGE) OF THE CLAIM AND AN EARLY EVALUATION CONFERENCE.

IN ORDER TO REQUEST THE STAY AND EARLY EVALUATION CONFERENCE, YOU WILL NEED TO VERIFY THAT A CERTIFIED ACCESS SPECIALIST HAS INSPECTED THE SITE THAT IS THE SUBJECT OF THE CLAIM. YOU WILL ALSO BE REQUIRED TO PROVIDE THE COURT AND THE PLAINTIFF WITH A COPY OF A WRITTEN INSPECTION REPORT BY THE CERTIFIED ACCESS SPECIALIST, AS SET FORTH IN CIVIL CODE SECTION 55.54.

THE APPLICATION FORM AND INFORMATION ON HOW TO REQUEST A STAY AND EARLY EVALUATION CONFERENCE MAY BE OBTAINED AT http://www.courtinfo.ca.gov/selfhelp/.

YOU ARE ENTITLED TO REQUEST, FROM A CERTIFIED ACCESS SPECIALIST WHO HAS CONDUCTED AN INSPECTION OF YOUR PROPERTY, A WRITTEN INSPECTION REPORT AND OTHER DOCUMENTATION AS SET FORTH IN CIVIL CODE SECTION 55.53. YOU ARE ALSO ENTITLED TO REQUEST THE ISSUANCE OF A DISABILITY ACCESS CERTIFICATE, WHICH YOU MAY POST ON YOUR PROPERTY IF IT IS FOUND TO MEET APPLICABLE CONSTRUCTION-RELATED ACCESSIBILITY STANDARDS.



**Report Limitations**

This report is limited to the areas addressed and was created to provide our best opinion on the required state and federal access requirements for this property. It does not identify every possible de mini mus violation, but focuses on the access barriers we observed and to alert you as to the general requirements of the CBC and ADAAG.

This report does not (and can not) indemnify you from every possible interpretation of these codes or any future access lawsuit brought by a party that disagrees with these opinions or is just wrong in their allegations.

This report is not intended to be an exhaustive or perfect analysis, nor can it be thoroughly conclusive. Accessibility compliance is far from empirical and interpreting the intent and meanings of the regulations can be ambiguous. The meaning of terms such as "readily achievable", "undue burden", "structurally impractable" and "reasonable accommodation" can be a challenging exercise and results in a spectrum of interpretations by the courts, other experts, juries, plaintiff's and defendants, as well as building officials.

This document does not provide an interpretation of legal rights or responsibilities. This report does not warrant, guarantee, or represent compliance with all accessibility standards or any legal standing that arises with or occurs subsequent to these services and work product.

However, we are confident that this report does provide the information, that when implemented, will bring you into substantial compliance with the applicable codes and requirements and provide significant protection against future access problems.

Yours truly,

Kim R. Blackseth, ICC, CASp

*State of California Certified Access Specialist (CASp #021)*
*State of California Building Standards Commissioner (2006-2007)*
*California Board for Professional Engineer and Land Surveyors (2007)*
*International Conference of Building Officials # 1085694-12*
*ICC Certified Accessibility Inspector/Plans Examiner #20112*
*Member of the Western Region Master Builders Association*
*California General Building Contractor # 363311, since 1978*